IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| ROYWELL SERVICES, INC. | § | CASE NO. 16-60070-V-11 |
| | § | |
| Debtor. | § | Judge David R. Jones |
| | § | |

EMERGENCY MOTION (I) FOR INTERIM AUTHORITY TO
USE CASH COLLATERAL (II) TO INCUR POST PETITION
INDEBTEDNESS UNDER 11 U.S.C. §363, §364(b), §502(b), §503(b) AND §105
AND (III) REQUEST FOR PRELIMINARY AND FINAL HEARINGS

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE OUR RESPONSE WITHIN 23 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 23 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Roywell Services, Inc. (hereinafter "Debtor" or "Roywell"), debtor and debtor in possession, files this *Emergency Motion (I) for Order Granting Interim Authority to Use Cash Collateral (II) to Incur Post Petition Indebtedness Under 11 U.S.C. §363, §364(b), §502(b) §503(b) and §105 and (III) for Preliminary and Final Hearings* (the "Motion") and in support

thereof, respectfully states as follows:

## I. Summary and Emergency Basis

1. This Chapter 11 case was filed on June 6, 2016.

2. The Debtor hereby seeks authorization to use cash collateral on an interim basis. Without such relief, the Debtor will suffer immediate and irreparable harm because the Debtor would be required to cease operations immediately, and the Debtor's ability to sell its business as a going concern would be eliminated. Immediately prior to bankruptcy, Roywell LLC, a Delaware limited liability company, was formed by an unrelated party to purchase the senior secured debt from Capital One Bank and to act as the Dip Lender and Stalking Horse Bidder ("RLLC"). Upon approval of this Motion, RLLC, which holds liens on substantially all of the Debtor's assets including accounts receivable, will be given replacement liens on post-petition receivables for use of its cash collateral in accordance with the proposed budget attached hereto as **Exhibit A.**

3. In the short term, the Debtor's revenues are wholly insufficient to fund ongoing operations. Consequently, the Debtor requires an immediate infusion of funds to pay ongoing expenses in the near term. Thus, RLLC will provide secured DIP financing, pursuant to 11 USC § 364(c) and in accordance with the DIP Financing Agreement, up to $3.0 million to cover any shortfall. The debt shall be secured by second priority liens on all of the Debtor's assets and an allowed super priority claim.

## II. Jurisdiction and Venue

4. This Court has jurisdiction over these cases pursuant to 28 U.S.C. §§ 157, 1334.

5. This is a core proceeding under 28 U.S.C. § 157(b)(2)(D).

6. Venue of the Debtor's Chapter 11 case is proper in this district pursuant to 28 U.S.C. §§ 1409.

### III. Introduction

7. The above captioned Chapter 11 bankruptcy case was filed on June 6, 2016, under Chapter 11 of Title 11 of the Bankruptcy Code, 11 U.S.C. §§101 et sq. (the "Bankruptcy Code"). The Debtor continues to manage its property as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

8. No trustee or examiner has been appointed in the Debtor's bankruptcy case. An official committee of unsecured creditors has not yet been established.

9. A detailed factual background of the Debtor's business and operations, as well as the commencement of this Chapter 11 case, is more fully set forth in the *Declaration of in Support of the Debtor's Chapter 11 Petition and Requests for First-Day Relief* filed contemporaneously herewith and incorporated herein by reference.

### IV. Background

#### A. Overview of Debtor

10. Roywell conducts its primary operations in the state of Texas with offices in Houston, and Corpus Christi, Texas and maintenance and operating work sites serving the major southwest basins (the Permian, Eagle Ford Shale, and Mid-Continent) in Victoria, Odessa, Taft, Refugio, and Kennedy, Texas and Thomas, Oklahoma. Approximately 70% of Roywell's revenues are generated from its Eagle Ford Shale operating locations. Roywell holds 200+ Master Service Agreements with numerous producers and operators in the oil and gas industry. Roywell's primary service, making up one-half of its operations, involves blending "raw" hydrochloric acid with water and other chemicals for use in oil and gas well completions.

Roywell's operations provide a complete suite of oilfield related services which are segmented into three divisions, (1) acid blending and logistics, (2) pumping, and (3) water transfer services.

11. Historically, Roywell was very successful in its business operations and had gross revenues in the amount of $111,172,880 in 2014. However, due to the unexpected downtown in the oil and gas industry within the past two years, Roywell's profits, like that of all other oil and gas service providers, has suffered significantly during the past year. Roywell also began actively and diligently seeking investments from third parties to continue its business operations. However, the unprecedented decrease in oil and gas prices and the unforeseen overall downturn in the oil and gas industry has negatively impacted the value of Roywell's assets. Roywell has rigorously attempted to reduce its operational costs by reducing its employee count from 337 in November 2014 to 78 in January 2016 and shutting down its sand hauling operations in 2015. However, Roywell was unable to find investors who were willing to contribute the funds necessary to keep the company from ceasing operations and releasing its remaining employees.

12. Roywell manages its cash, receivables, and payables through a centralized cash management system (the "**Cash Management System**"). The Cash Management System utilizes a total of 7 bank accounts held with Capital One Bank (collectively, the "**Bank Accounts**").

13. Roywell uses the Cash Management System to efficiently collect, transfer, and disburse funds generated from its operations. The company maintains accounting controls with respect to each of the Bank Accounts and is able to accurately trace the funds through its Cash Management System to ensure that all transactions are adequately documented and readily ascertainable. Roywell will maintain its books and records relating to the Cash Management System to the same extent such books and records were maintained prior to the Petition Date. Accordingly, Roywell will be able to accurately document, record, and trace the transactions

occurring within the Cash Management System for the benefit of all parties-in-interest.  As is reflected in the Motion to Continue Using Cash Management System filed contemporaneously herewith, Roywell thus desires to continue to maintain and use its cash management system and Bank Accounts in the ordinary course of business, consistent with its past practices.

### B. Financing History

14. Effective November 30, 2011, Roywell entered into a credit agreement with Capital One Bank (the "Credit Agreement").  The Credit Agreement initially provided for an installment note in the amount of $7,000,000 (the "Installment Note"), an equipment loan facility in the amount of $3,000,000 (the "Equipment Loan"), and a revolving credit line of $5,000,000 (the "Credit Line").  The Installment Note was payable in forty-eight (48) monthly installments of $145,833 plus interest and matured on November 30, 2015.  The proceeds from the Installment Note were used to pay-off installment consolidated notes payable to another lender.  The Equipment Loan was used to purchase equipment and was converted to an amortizing note with forty-eight monthly installments of $62,200 plus interest and was scheduled to mature on November 30, 2016.  In December 2012, Roywell obtained an additional $2,000,000 equipment loan from Capital One Bank which was converted to an amortizing note with forty-eight installments and maturing on June 30, 2017.  The Credit Line was renewed and extended on October 15, 2014. .

15. In conjunction with the Credit Agreement, Roywell executed certain Security Agreements dated on or about December 6, 2011 and October 15, 2014, granting Capital One Bank a security interest in substantially all of its assets.  Capital One Bank filed UCC-1 financing statements with the Texas Secretary of State on December 6, 2011, and October 16,

2014.  As of the Petition Date, the outstanding balance owing under the Credit Agreement is the sum of approximately $13,916,000.00.

16.  On June 6, 2016,  all of the Capital One Bank debt was assigned to a Roywell LLC, a Delaware limited liability company ("RLLC") owned by Catapult Services, a private equity company in the oil field services industry.

## BASIS FOR REQUESTED RELIEF

### A. Cash Collateral and Authority to Use

17. As stated above, prior to the Petition Date, the Debtor entered into the Credit Agreement whereby liens and security interests in substantially all of the Debtors assets, including accounts receivable and cash (collectively "Collateral") were granted to  Capital One Bank.   The Loans and security documents were subsequently assigned to RLLC.

18. The Debtor hereby seeks authority to use cash collateral in connection with this Bankruptcy Case to preserve the value of Debtor's businesses.  Pursuant to the Bankruptcy Code, the Debtor is required to provide adequate protection to the Lender with respect to Debtor's use of cash Collateral.

19. RLLC is owed collectively more than $13.9 million with respect to the Indebtedness. The value of the collateral is far less than the debt.  The Debtor expects that an agreed order for use of cash collateral will include, among others, the following:

> A. Debtor may each use cash collateral pursuant to approved budgets, with a 10% variance per line item so long as the amount of cash collateral used does not exceed the total amount for each weekly period in the budget.  Unused amounts in one weekly period may be carried over to the next week only.  Debtor must obtain the written consent of RLLC for a variance in excess of 10% per line item or the total amount for each weekly period.

> B. The Lender's prepetition liens will be adequately protected by replacement liens on post petition liens on accounts receivable to the same extent and priority as its respective prepetition liens.

20. The only viable source of funding for post-petition operations is cash collateral made available to the Debtor and DIP financing described herein.

21. Without the use of cash collateral on an interim basis, the Debtor would suffer immediate and irreparable harm pending a final hearing on the Motion and would likely be required to cease operations immediately, causing harm to the Debtor, the estate, the Debtor's customers, and the employees.

22. The importance in cases like these of access to cash was recognized in *In re George Ruggieri Chrysler-Plymouth, Inc.*, 727 F.2d 1017 (11th Cir. 1984). The court in that case noted: "A debtor, attempting to reorganize in business under Chapter 11, clearly has a compelling need to use 'cash collateral' in its effort to rebuild." Id. at 1019. 31. The Debtor anticipates that the Lender will consent to the proposed use of cash Collateral, subject to receiving replacement liens and perhaps other protections as provided in an agreed order. To the extent it does not consent, however, the Court may authorize the use of cash collateral by the Debtor provided that the Court determines that any objecting entity's interest is adequately protected. 11 U.S.C. § 363(c)(2)(B) and (e).

23. Section 361 sets forth three non-exclusive examples of what may constitute adequate protection. They include providing the secured creditor with "additional or replacement liens" and other relief that provides the secured creditor with the "indubitable equivalent" of the secured creditor's interest in the cash collateral. Legislative history indicates that Congress intended to provide courts with flexibility to grant relief on a case-by-case basis.

24. Pursuant to the Motion, the Debtor proposes to grant the Lender replacement liens on post-petition accounts receivable, a recognized method for providing adequate protection as specified under sections 361 and 363.

25. In exchange for the use of cash Collateral, as adequate protection for the use of the cash Collateral, but only to the extent of the actual diminution in value of the pre-petition Collateral, the Debtor proposes to grant to the Lender replacement liens in the form of security interests and liens upon the same types and kinds of assets upon which they held a prepetition lien, subject only to valid, perfected, and enforceable prepetition liens (if any) which are senior as of the Petition Date, as well as an additional lien upon the Debtor's post-petition accounts and accounts receivables. The grant of replacement liens will only apply to the extent that the pre-petition Collateral was encumbered by valid and perfected liens and security interests (collectively, the "Replacement Liens").  The Replacement Liens will not attach to any avoidance actions under Chapter 5 of the Bankruptcy Code.

26.  Without access to cash Collateral, operations will cease.  The going concern of the Debtor's assets will plummet, receivable collections will dry up and key employees will resign. From that standpoint, the overall collateral position of Lender will deteriorate markedly, more than offsetting any erosion of the cash collateral.

27.  Bankruptcy Rule 4001(c)(2) states that 14 days' notice must be given before final approval of such cash Collateral use is given.  With this Motion, the Debtor is providing the Lender with 14 days' notice between the time of the filing of this Motion and request that the Court set a final hearing on this matter upon expiration of the 14-day notice period.  The Debtor will suffer irreparable harm if the Motion is not immediately considered as it does not have the funds to continue operations.  There is little harm to general unsecured creditors under this agreement since the Lender already apparently has a first lien on substantially all of the Debtor's assets.  Thus, if the Debtor cannot fund operations, it will have to cease operating and Lender

may seek to enforce its remedies in its collateral subject to the respective lien, leaving nothing for unsecured creditors. Accordingly, emergency consideration of this motion is required.

### B. DIP Financing and Legal Standard

28. Subject to court approval, pursuant to 11 U.S.C. § 364(c), RLLC ("DIP Lender") has agreed to provide secured DIP financing to the Debtor in an amount up to $1 million (the "DIP Facility"). The debt shall be secured by a second lien on all of the Debtor's assets and allowed as a super priority claim pursuant to 11 U.S.C. § 364(c)(1). Debtor requests authority to use necessary funds to pay expenses on the budget attached hereto as Exhibit "A".

29. The DIP Facility will be used to help fund Debtor's operations while the Debtor effectuates a sale of its business as a going concern pursuant to an auction process with RLLC as the Stalking Horse Bidder.

30. If the DIP financing is not approved, Debtor will have to cease operations, terminate its employees, and liquidate its assets at much lower return than is expected from a sale of the business as a going concern.

31. The material terms of the DIP Revolving Credit Note are as follows:

| Borrower | Roywell Services, Inc. |
|---|---|
| **Revolver** | The DIP Facility shall comprise a commitment for up to $3.0 million funded by RLLC or an entity designated by it. The DIP Facility will be funded through Draw Requests set forth below. |
| **Use of Proceeds** | The proceeds of the DIP Facility shall generally be used (1) to finance working capital needs and general corporate purposes of the Debtor, all in accordance with the applicable DIP Budget; (2) to pay the fees, costs and expenses incurred by the Debtor in connection with its chapter 11 case including payment of Debtor's counsel's fees; and (3) to pay interest to and the fees, costs, and expenses of the DIP Lender. |
| **Interest Rate** | Wall Street Prime Rate + 5%, with a floor of 3.25%. Upon disbursement of the First Draw, interest shall at all times accrue on outstanding balance under the DIP Facility until all amounts owed by the Borrower under the DIP Facility have been paid in full. |

| | |
|---|---|
| **Commitment Fee** | None. |
| **First Draw** | Funded upon approval of the DIP Motion by an Interim Order acceptable to the DIP Lender in its sole discretion to cover expenses set forth in the approved budget. |
| **Subsequent Draws and availability thereof** | Subsequent Draws shall be made upon request to cover all expenses set forth in the approved budget so long as no defaults exist. |
| **Payments Into the Lock Box** | All proceeds of pre-petition and post-petition accounts receivable shall be deposited into a lock box and applied first against the pre-petition revolving line of credit. If there is any surplus, it shall be applied to the DIP Loan. Any unpaid accrued interest will be payable upon maturity. |
| **Maturity** | July 30, 2016.  If the debt is not paid in full by maturity or such later time as agreed to by RLLC, the stay shall automatically lift to permit RLLC to foreclose to satisfy the pre-petition and post-petition debts. |
| **Liens** | In order to secure the Postpetition Debt, effective immediately upon entry of the DIP Order, the DIP Lender shall be granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition second priority security interests (the "DIP Liens"), on all assets of the Debtors. |
| **Superpriority Claim** | Upon entry of the Interim Order, the DIP Lender shall be granted, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority claim against the Debtor in the Chapter 11 Case and any successor cases for all Postpetition Debt. To the extent permissible under the Bankruptcy Code, the superpriority claim shall be subordinate only to the Postpetition Liens. To the extent permitted by the Bankruptcy Code, the superpriority claim (a) shall otherwise have priority over any and all administrative expense claims and unsecured claims against the Debtor or its estate in the Chapter 11 Case and any successor cases except for professional fees.<br>The DIP Facility shall be binding on any subsequently appointed chapter 7 trustee. |

32. Copies of the DIP Revolving Credit Note and Security Agreement are attached as Exhibit "B". Debtor requests that this credit facility be allowed under 11 U.S.C. § 364(c)(1), subject only to the payment of professional fees, and that DIP Lender be granted a second priority lien on all of the Debtor's assets.

33. The Debtor believes that it has business justification for entering into the DIP financing in order to ensure that future operations are funded and the value of the Collateral maintained.

34. Thus, the Debtor asks for this Court to authorize it to enter into the DIP Revolving Credit Note with DIP Lender, in an amount up to $1 million and allow this credit facility as secured under 11 U.S.C. §364(b), and as an administrative expense under 11 U.S.C. § 503(b) or 507(b), subject only to administrative fees and expenses of professionals allowed under Section 327 of the Bankruptcy Code.

35. Each of the liens and claims of the DIP Lender granted to the DIP Lender in connection with the use of cash collateral and the DIP Facility shall be subject to a carve-out (the "Carve-Out") for the following: (a) allowed administrative expenses pursuant to 28 U.S.C. § 1930, and (b) the allowed fees and expenses to Debtor's counsel in this bankruptcy case in an amount up to $150,000.00.  Carve-Outs for professional fees have been found to be reasonable and necessary to ensure that Debtor's estate and any statutory committee can obtain appropriate assistance from counsel and other professionals.  *See, e.g. Ames Dept. Stores, Inc.* 115 B.R. 34 (Bankr. S.D.N.Y. 1990).

36. Despite efforts to the contrary, the Debtors are unable to obtain alternative financing on reasonable terms.  Further, the proposed terms of the DIP Financing are favorable and it is unlikely that better terms could otherwise be negotiated.

37. The DIP Financing Agreement will be used to help fund the Debtor's operations, as necessary, until a sale of the business can be finalized.  Debtor anticipates finalizing a sale prior to the maturity of the DIP Promissory Note.

38. If the DIP Financing Agreement is not approved, Debtor will be unable to continue operations and manage its business.

39. The Debtor requests that this Court enter the preliminary order attached hereto; set a final hearing on this Motion with 14 day notice pursuant to Bankruptcy Rule 4001 if objections

are filed, and at such hearing, authorize the Debtor to continue using its cash Collateral for the remainder of this Chapter 11 case.

## V. Conclusion

WHEREFORE, the Debtor respectfully requests that the Bankruptcy Court:

1) Set an emergency preliminary hearing on this Motion;

2) Enter a preliminary order authorizing the use of cash collateral pursuant to the attached budget for 14 days;

3) Enter a preliminary order authorizing the Debtor to incur post-petition indebtedness as an administrative claim on an interim basis;

4) Set a final hearing on this Motion after expiration of fourteen (14) days notice period required by Bankruptcy Rule 4001; and

5) Granting all such other and further relief as is just and proper.

DATED:      June 6, 2016

Respectfully submitted,

*/s/ Theresa Mobley*
THERESA MOBLEY
State Bar No. 14238600
VIANEY GARZA
State Bar No. 24083057

OF COUNSEL:
CAGE, HILL & NIEHAUS, L.L.P.
5851 San Felipe, Suite 950
Houston, Texas 77057
Telephone: (713) 789-0500
Telecopier: (713) 974-0344
PROPOSED ATTORNEYS FOR
ROYWELL SERVICES, INC.

## CERTIFICATE OF CONFERENCE

I hereby certify that the counsel for the Debtor has conferred with Edward L. Rothberg,

counsel for the Lender, in an effort to reach an agreement on the interim use of cash collateral. Although an agreement has not yet been reached, the parties will continue to discuss the terms of an acceptable interim order.

    /s/    *Theresa Mobley*